# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

MATTHEW RYAN MCBEE,

Defendant-Appellant.

UNPUBLISHED
May 9, 2017

No. 330048
Oakland Circuit Court
LC No. 2014-249679-FC

Before: TALBOT, C.J., and K. F. KELLY and BORRELLO, JJ.

PER CURIAM.

Matthew Ryan McBee was convicted by a jury of first-degree criminal sexual conduct (CSC-I)[1] and sentenced to 25 to 60 years' imprisonment. He appeals as of right. We affirm.

## I. FACTS

On the morning of January 8, 2014, seven-year-old HM told her mother, Heather Smith, that McBee—Smith's boyfriend—made her "drink his milk." HM also said something about magazines[2] and pointed to a metal, clipboard-style container that was sitting on a nearby dog crate next to the stairs. Smith looked inside the container and discovered several pornographic magazines. Smith eventually learned that the encounter between HM and McBee occurred the day before.

At trial, HM testified that on January 7, 2014, she was sitting on the living room couch while McBee played video games. Smith and HM's sister were asleep in their bedrooms. McBee paused his game and showed her pornographic magazines he retrieved from the clipboard-style container. McBee then made her put his "jina" in her mouth and "made me suck it, then -- then the milk got in my mouth." HM explained that a "jina" was a "boy part" used for going to the bathroom. Later, she clarified that she used the terms "jina" and "peter" because she

---

[1] MCL 750.520b(1)(a) (penetration with person under 13).

[2] It appears that HM's verbal skills were under-developed for her age. Several witnesses referred to HM's speech and educational delays, and HM testified that she had been held back in school.

-1-

was not allowed to say "dick." According to HM, the milk made her sick and some of the milk got on the living room couch and on her dress.

Smith called the police on January 8, 2014, after learning about HM's accusation. Several items were seized from the home, including a metal clipboard containing several pornographic magazines and the cushions from the two living room couches. HM was examined at Beaumont Hospital; there were no obvious signs of trauma and HM's hymen appeared normal. Of the items submitted for forensic analysis, only three tested positive for the presence of body fluids: the underwear HM said she wearing at the time of the incident, a vulvar swab obtained during HM's vaginal examination, and the center cushion taken from one of McBee's couches. The DNA discovered on the vulvar swab and HM's underwear were consistent with her own DNA profile. A partial DNA profile was recovered from sperm cells found on the couch cushion and it matched McBee's DNA profile at four of the 16 locations typically tested. McBee's DNA profile could not be excluded at five additional locations.

HM was interviewed by Yvonne Cameron at CARE House of Oakland County on January 8, 2014. Defense witness Dr. Katherine Okla, an expert in forensic interviewing techniques, memory, and suggestibility, noted certain elements of the CARE House interview which she did not feel complied with Michigan's Forensic Interviewing Protocol and expressed concern that several elements of HM's story were still unclear after the interview. Dr. Okla observed that Cameron failed to ask sufficient follow-up questions to clarify some of HM's ambiguous statements and did not seem to engage in clear and explicit alternative hypothesis testing. Dr. Okla also opined that HM's memory might have been impacted by other experiences, including her repeated conversations with Smith earlier in the day, Smith's negative reaction to the disclosure, earlier discussions with family members about sexual touching, unrelated child protective services investigations, and the understanding that McBee would be incarcerated.

The prosecution's rebuttal witness, Sarah Visger Killips, was qualified as an expert in forensic interviewing, the dynamics of sexual abuse, and characteristics of children who allege sexual abuse. Killips agreed that one of the primary goals of forensic interviewing is to engage in "hypothesis testing," rather than "hypothesis confirming." Having reviewed HM's CARE House interview, Killips opined that several alternative hypotheses were, in fact, tested, though not always through direct questioning. Killips disagreed with Dr. Okla's suggestion that there was inadequate clarification with respect to source monitoring and whether HM was reporting things she had experienced, rather than things she had seen. Killips also disagreed with Dr. Okla's opinion regarding the likelihood that HM's memory was tainted by outside sources.

## II. PROSECUTORIAL ERROR

For his first claim of error, McBee contends that the trial court erred by denying his motion for a mistrial, which was based on prosecutorial error. According to McBee, he was denied the right to a fair trial because the prosecution accused him of selling drugs. We disagree.

We review a trial court's ruling on a motion for mistrial for an abuse of discretion.[3] An abuse of discretion occurs when the trial court's decision falls outside the range of principled outcomes.[4] "The trial court should only grant a mistrial for an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial and when the prejudicial effect of the error cannot be removed in any other way."[5] "Issues of prosecutorial misconduct [or error] are reviewed de novo to determine whether the defendant was denied a fair and impartial trial."[6] When the alleged prosecutorial error does not violate a specific, enumerated constitutional right, the defendant bears the burden of "establishing that it is more probable than not that the error in question undermine[d] the reliability of the verdict, thereby making the error outcome determinative."[7]

McBee's claim of prosecutorial error arises from the following question posed to defense witness Korey Eiermann on cross-examination: "Were you aware of text messages going back and forth between your wife and the Defendant and your wife is purchasing drugs from the Defendant?" Although the question went unanswered, McBee maintains that the question itself was akin to an accusation that he was a drug dealer. The trial court acknowledged that Eiermann's anticipated testimony might be inadmissible under MRE 403, but declined to rule on the matter, instead taking McBee's motion under advisement. When the matter was addressed again before McBee's sentencing, the trial court noted that, in hindsight, the prosecution's inquiry lacked any probative value. Nonetheless, it denied McBee's motion, reasoning that the probative value of the inquiry "at the time" was not substantially outweighed by the danger of unfair prejudice.

As an initial matter, it must be noted that the trial court erred by denying McBee's motion on the basis of a retrospective application of MRE 403 because the plain language of the rule only calls for balancing of the relative probative value and prejudicial effect of proffered *evidence*.[8] McBee's claim of error rests on the premise that he was prejudiced by the prosecution's *question*, and lawyers' questions are not evidence.[9] As already noted, the

---

[3] *People v Lane*, 308 Mich App 38, 60; 862 NW2d 446 (2014).

[4] *Id*.

[5] *Id*. (quotation marks and citations omitted).

[6] *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). See also *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015) (regarding prosecutorial error).

[7] *People v Blackmon*, 280 Mich App 253, 261, 270; 761 NW2d 172 (2008) (quotation marks and citation omitted) (alteration in original).

[8] "Although relevant, *evidence* may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403 (emphasis added).

[9] *People v Mesik (On Reconsideration)*, 285 Mich App 535, 541; 775 NW2d 857 (2009).

appropriate test for a claim of prosecutorial error is whether the defendant was denied a fair and impartial trial.[10]

"A defendant's opportunity for a fair trial can be jeopardized when the prosecutor interjects issues broader than the defendant's guilt or innocence."[11] In reviewing a claim of prosecutorial error, the challenged conduct must be viewed in context.[12] A good-faith attempt to introduce evidence does not constitute prosecutorial error, "as long as that attempt does not prejudice the defendant."[13] Reversal is unwarranted on the basis of seemingly improper prosecutorial conduct or remarks if they address an issue raised by the defense.[14]

We agree with McBee's argument that the prosecution's question sought to illicit irrelevant—and, therefore, inadmissible—evidence. Despite the prosecution's arguments to the contrary, McBee's purported history of selling drugs to Eiermann's wife was not relevant for the purpose of impeaching Eiermann's credibility or rebutting McBee's accusation that Smith stole items from his house, including prescription medication. However, while we agree that the prosecution erred by asking this question of Eiermann, we do not believe that the error was so prejudicial that it deprived McBee of a fair and impartial trial.

This Court previously considered the effect of similar prosecutorial error in *People v Mesik (On Reconsideration)*.[15] In that case, the defendant claimed that he was denied a fair trial when the prosecution repeatedly questioned him about inadmissible hearsay statements in which a witness reported that the defendant and a coconspirator had taken credit for killing the victim.[16] This Court determined that the prosecution's questions were misleading and improper, as the preliminary examination transcript to which the prosecution was referring was not produced and did not include several of the statements the prosecution attributed to the witness.[17] However, the Court explained that the prosecution did not actually introduce inadmissible hearsay against the defendant:

> Had [the] defendant confirmed, as a witness from the stand, any of the assertions by the prosecutor, those confirmations would have constituted evidence. But [the] defendant only denied any recollection of the matters about which he was

---

[10] *Bennett*, 290 Mich App at 475.

[11] *People v Dobek*, 274 Mich App 58, 64-65; 732 NW2d 546 (2007).

[12] *Id.* at 64.

[13] *People v Noble*, 238 Mich App 647, 660-661; 608 NW2d 123 (1999).

[14] *Dobek*, 274 Mich App at 64.

[15] *Mesik (On Reconsideration)*, 285 Mich App 535.

[16] *Id.* at 539-541.

[17] *Id.* at 540.

asked. Although the prosecutor's questions were, as noted, misleading and improper, the prosecutor's questions are not evidence . . . .[18]

Furthermore, the Court noted that the jury was properly instructed about what constitutes evidence and the fact that lawyers' questions should not be treated as evidence.[19] Thus, it reasoned that the trial court's instructions cured any prejudice arising from the improper questioning and "there is no evidence from which [it] can conclude that the jury was unable to follow its instructions . . . ."[20]

Like in *Mesik (On Reconsideration)*, the prosecution's error did not result in the presentation of inadmissible evidence against McBee. Defense counsel objected to the prosecution's question before Eiermann answered, and the prosecution chose not to resume that line of inquiry when the jury proceedings resumed. Moreover, the prosecutorial error in this case was far less prejudicial than that at issue in *Mesik (On Reconsideration)*. In *Mesik (On Reconsideration)*, the prosecution's improper questions repeatedly referred to statements made by the defendant and his coconspirator admitting that they jointly committed the charged crime.[21] By contrast, the prosecution in this case asked a single question about a completely collateral matter that did not weigh upon McBee's guilt or innocence of CSC-I.

McBee points to posttrial comments made by several jurors to demonstrate that he was unfairly prejudiced by the prosecution's question. However, McBee's assertion rests on the affidavit of his trial counsel, describing the jurors' comments. The affidavit does not adequately support his claim of error as it attempts to set forth inadmissible hearsay.[22] Moreover, even if this Court were to consider the affidavit, its language is fairly ambiguous and does not demonstrate with any level of certainty that the commenting juror's opinion regarding McBee's guilt was swayed by the prosecution's question or that the remaining jurors were similarly affected.[23]

---

[18] *Id*. at 540-541.

[19] *Id*. at 541.

[20] *Id*.

[21] *Id*. at 539.

[22] See *People v Budzyn*, 456 Mich 77, 92 n 14; 566 NW2d 229 (1997) (explaining that an attorney cannot provide hearsay testimony concerning a juror's statements).

[23] According to McBee's trial counsel, the officer in charge asked the jury "how one of the female witnesses presented herself," which prompted an unidentified juror to comment on the "drug sale" issue. Other jurors stated that they "did not consider it," but yet another juror said, "[I]t wasn't like I could disregard that I heard it." As the comments were purportedly made in response to an inquiry about the testimony of a female witness, it is equally probable that the jurors were referring to Smith's testimony regarding disposing of McBee's Percocet after his arrest, rather than the prosecution's cross-examination of Eiermann.

### III. JUROR MISCONDUCT

Next, McBee argues that the trial court erred by denying his motion for a mistrial on the alternative basis of juror misconduct. We disagree.

As already stated, a trial court's ruling on a motion for mistrial is reviewed for an abuse of discretion.[24] When the defendant's motion is based on juror misconduct, the trial court abuses its discretion by denying the motion "only where the misconduct was such that it affected the impartiality of the jury or disqualified its members from exercising the powers of reason and judgment."[25] A trial court's ruling on a party's request for an evidentiary hearing is also reviewed for an abuse of discretion, which occurs "when the court chooses an outcome that falls outside the range of reasonable and principled outcomes."[26]

"During their deliberations, jurors may only consider the evidence that is presented to them in open court."[27] When jurors consider extraneous facts not in evidence, several constitutionally protected rights are implicated, including the "rights of confrontation, cross-examination, and assistance of counsel embodied in the Sixth Amendment," such that a new trial may be required.[28] A two-part test is applied to determine if a jury's exposure to extraneous information requires reversal of its verdict:

> First, the defendant must prove that the jury was exposed to extraneous influences. Second, the defendant must establish that these extraneous influences created a real and substantial possibility that they could have affected the jury's verdict. Generally, in proving this second point, the defendant will demonstrate that the extraneous influence is substantially related to a material aspect of the case and that there is a direct connection between the extrinsic material and the adverse verdict.[29]

As he did in the trial court, McBee maintains that he is entitled to a new trial due to juror misconduct. McBee bases this assertion solely on an affidavit provided by defense witness Melissa Raderstorf. In pertinent part, Raderstorf states: "That while at work on September 26, 2014, I overheard two teachers discussing the trial; to wit, that one of the teachers had received a text message from one of the jurors with ties to the school and that the juror commented on the

---

[24] *Lane*, 308 Mich App at 60.

[25] *People v Messenger*, 221 Mich App 171, 175; 561 NW2d 463 (1997).

[26] See, e.g., *People v Unger*, 278 Mich App 210, 216-217; 749 NW2d 272 (2008) (evidentiary hearing regarding admissibility of proposed expert testimony); *People v Martin*, 271 Mich App 280, 309; 721 NW2d 815 (2006) (evidentiary hearing regarding validity of search warrant).

[27] *Budzyn*, 456 Mich at 88.

[28] *Id*.

[29] *Id*. at 89-90 (citations omitted).

trial."[30] McBee's reliance on Raderstorf's affidavit is misplaced. Like the affidavit proffered by his trial counsel in support of his first claim of error, Raderstorf's affidavit contains inadmissible hearsay that will not be considered by this Court.[31]

McBee's argument lacks merit in any event. Even if Raderstorf's affidavit was admissible, it would not satisfy McBee's burden of establishing the factual predicate for his claim of juror misconduct. Assuming, *arguendo*, that a juror communicated with a third-party in the manner asserted by Raderstorf, thereby violating the trial court's instruction against discussing the case with friends or family, there is no proof that the jury was exposed to extraneous information by that juror's misconduct. Raderstorf claims that her coworker received a text message from a juror—not that the juror received outside information from the coworker. In the absence of evidence that the jury was exposed to extraneous information, there can be no basis for concluding that the jury's impartiality or verdict was somehow affected. Accordingly, the trial court did not abuse its discretion by denying McBee's motion for mistrial.

Nor does it appear that McBee is entitled to an evidentiary hearing at this juncture. McBee has failed to cite any authority for this proposition, and "an appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority."[32] The trial court has twice denied McBee's request for an evidentiary hearing, and correctly observed that McBee failed to offer any evidence regarding the substance of the text message, which could have been an innocent exchange. The trial court explained that there was better evidence regarding the substance of the communication than the double hearsay contained in Raderstorf's affidavit, implicitly suggested that McBee subpoena the actual text message or messages exchanged or obtain other credible evidence from those involved, and denied the motion without prejudice. Nonetheless, McBee failed to take any action to obtain the text message or messages, ascertain the contents, or even confirm the identity of the individuals involved in the communication before filing a second motion requesting an evidentiary hearing over eight months later. It was not outside the range of principled outcomes for the trial court to deny McBee the opportunity for a further hearing when his request was premised on little more than unsubstantiated speculation.

## IV. WITNESS VOUCHING

Next, McBee argues that the prosecution's expert witness, Killips, improperly vouched for HM's credibility, and that he was denied the effective assistance of counsel when his trial counsel failed to object to Killips's testimony on that ground. We disagree.

---

[30] It is reasonable to conclude that the juror "with ties to the school" was Juror 14, as Juror 14 had promptly disclosed after Raderstorf's testimony that she recognized Raderstorf from their mutual place of employment.

[31] *Budzyn*, 456 Mich at 92 n 14.

[32] *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998).

To the extent that this claim of error rests on the admissibility of Killips's testimony, McBee failed to preserve this issue by objecting to Killips testimony on that basis.[33] "A defendant pressing an unpreserved claim of error must show a plain error that affected substantial rights, and the reviewing court should reverse only when the defendant is actually innocent or the error seriously affected the fairness, integrity, or public reputation of judicial proceedings."[34] However, McBee did preserve his related ineffective assistance of counsel claim by raising it in a motion for a new trial.[35] Ineffective assistance of counsel claims present a mixed question of fact and constitutional law.[36] The lower court's findings of fact are reviewed for clear error, and its rulings on questions of constitutional law are reviewed de novo.[37] Although McBee preserved his ineffective assistance of counsel claim by moving for a new trial, "because no *Ginther*[38] hearing was held, our review is limited to mistakes apparent on the record."[39]

Determinations regarding witness credibility are within the sole province of the jury.[40] Thus, as a general rule, "it is improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial."[41] The prohibition against such testimony is particularly important in the context of criminal sexual conduct prosecutions, which often balance on the credibility of the complainant and the defendant. As our Supreme Court has explained, "To a jury recognizing the awesome dilemma of whom to believe, an expert will often represent the only seemingly objective source, offering it a much sought-after hook on which to hang its hat."[42]

McBee takes issue with three statements made by Killips. First, McBee contends that Killips implicitly vouched for HM's credibility when she explained that forensic interviewing techniques are designed to avoid inflicting "more damage than what's already happened." This argument lacks merit. Killips statement referred to the general goals of forensic interviewing, not HM's credibility. Moreover, on cross-examination, defense counsel explored McBee's theory that Killips's statement implied a preconception that a damaging event already occurred.

---

[33] *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001).

[34] *People v Parker*, 288 Mich App 500, 509; 795 NW2d 596 (2010), citing *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

[35] *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009).

[36] *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007).

[37] *Id.*

[38] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[39] *Payne*, 285 Mich App at 188.

[40] *People v Musser*, 494 Mich 337, 348-349; 835 NW2d 319 (2013).

[41] *Id.* at 349.

[42] *People v Beckley*, 434 Mich 691, 722; 456 NW2d 391 (1990).

Killips clarified that, even when it is determined that no abuse occurred, a child could still be traumatized by having to endure the investigative process.

Next, McBee contends that Killips conveyed her belief that HM was truthful by testifying that all alternative hypotheticals were explored and refuted. McBee's argument is unsupported by the record. The portion of the record McBee cites to in his brief on appeal involves Killips's opinion that two of the alternative hypotheticals discussed by Dr. Okla were inapplicable to HM's initial disclosure. That is, given the nature of HM's accusation, there was no reason to explore whether the alleged sexual contact arose from an accidental touching or innocent personal hygiene process. While Killips opined that several alternative hypothesis were, in fact, explored during HM's CARE House interview, the record is devoid of testimony indicating that *all* alternative hypotheticals were ruled out. Furthermore, Killips testimony regarding the alternative hypotheticals that were tested spoke more to the quality of the forensic interview than HM's credibility.

Lastly, McBee argues that Killips explicitly conveyed her belief that HM's disclosure was credible by way of the following exchange with the prosecution:

> *Q.* And so in a section of the forensic interview where [HM] is asked to consider the couch and the forensic interviewer was (inaudible) the couch and [HM] corrects her and says "No, ours is a brown one", is that helpful to you (inaudible) suggestibility or how suggestible [HM] is?
>
> *A.* Yes. It indicated that in that situation [HM] was able to say to this adult, authority figure, you're wrong and I feel comfortable telling you what my experience is.

In *People v Peterson*,[43] the Court considered the propriety of expert testimony concerning studies examining the frequency that children lie about sexual abuse. The Court observed that none of the expert witnesses expressly opined that the minor complainant was telling the truth, but reasoned that the risks inherent in expert testimony regarding witness veracity extend beyond such direct references.[44] For similar reasons, we agree that the quoted testimony improperly bolstered HM's credibility in an indirect manner. Unlike the other challenged testimony concerning the conduct of the forensic interview, the quoted statement pointed to an objective measure of HM's lack of suggestibility, thereby bolstering the credibility of her disclosure.

Nonetheless, although the admission of the improper testimony may have amounted to plain error, it does not appear that the error affected McBee's substantial rights. Such a conclusion would require "a showing of prejudice, i.e., that the error affected the outcome of the

---

[43] *People v Peterson*, 450 Mich 349, 377; 537 NW2d 857 (1995), amended on other grounds by 450 Mich 1212 (1995).

[44] *Id.*

lower court proceedings."[45]   Here, Killips was called as a rebuttal witness to respond to the testimony of defense expert Dr. Okla.  Although Dr. Okla's testimony generally focused on the conduct of the CARE House interview, she also referred to various statements made by HM that she believed were unreliable as a result of the deficiencies in the forensic interviewing techniques employed.  For example, Dr. Okla recalled that HM said, "He only made me drink the cream -- I think, oh, yeah, he did."  Dr. Okla noted that Cameron did not clarify what HM's use of the phase "I think" meant, and explained that:

> it appeared that [HM] wasn't quite certain, she was sort of thinking about it.  That might be because she had to go back and think about it or it may be that she didn't really know the answer.  And again, it's just -- we have to know, we can't guess or assume if there's any indication of uncertainty that, in fact, that is what she remembers.

By incorporating specific examples of HM's remarks that remained unclear after the interview, Dr. Okla's opinion regarding the conduct of the interview necessarily impacted the perceived veracity of HM's disclosures.

While we do not endorse the notion that "two wrongs make a right," under the circumstances of this case, it appears that any prejudice that resulted from Killips's testimony was counteracted by Dr. Okla's contrary opinion.  This is simply not a situation in which the jury was able to "hang its hat" on a single, improper, expert opinion regarding HM's credibility.  Rather, the jury was presented with two conflicting opinions regarding the implications of HM's reaction to the techniques used by Cameron during the CARE House interview.  There is no reason to believe that the outcome of the proceedings would have been different in the absence of Killips's improper testimony.

McBee's ineffective assistance of counsel claim must fail for similar reasons.  To prevail on a claim of ineffective assistance of counsel, the defendant must satisfy the two-pronged test established by the United States Supreme Court in *Strickland v Washington*.[46]  The defendant must demonstrate that " 'counsel's representation fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' "[47]  This Court presumes that defense counsel rendered effective assistance and exercised reasonable professional judgment in all significant decisions.[48]

---

[45] *Carines*, 460 Mich at 763.

[46] *People v Carbin*, 463 Mich 590, 599-600; 623 NW2d 884 (2001), citing *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

[47] *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012), quoting *Strickland*, 466 US at 688, 694.

[48] *Vaughn*, 491 Mich at 670.

Although Killips's testimony strayed into the realm of improper opinion regarding witness credibility, defense counsel did not render constitutionally deficient assistance by failing to object. When viewed in the context of rebutting Dr. Okla's expert opinion, Killips's statement was not so blatantly prejudicial to McBee that there could be no strategic reason for defense counsel's decision to refrain from objecting. Given the parallel nature of Dr. Okla's testimony, such an objection could have undercut the weight the jury afforded to Dr. Okla's favorable opinion. In any event, it is improbable that the outcome of the trial would have been different had defense counsel objected to Killips's single reference to an example of HM's lack of suggestibility. The reliability of the CARE House interview was examined at length, as was the impact that Cameron's interviewing techniques may have had on HM's disclosure. Additionally, HM reiterated her recollection of the January 7, 2014 incident at trial, thereby allowing the jury to form its own opinion regarding HM's credibility based on first-hand observations of her demeanor and manner of communicating.

## V. SEPARATION OF POWERS

Next, McBee argues that the 25-year minimum sentence mandated by MCL 750.520b(2)(b) violated the Separation of Powers Clause by depriving the trial court of its right to exercise sentencing discretion. We disagree.

Questions of constitutional law are generally reviewed de novo.[49] "Statutes are presumed to be constitutional, and the courts have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent."[50] However, because McBee failed to preserve this issue by raising it in the trial court, this Court's review is limited to plain error affecting substantial rights.[51] A defendant's substantial rights are affected when the plain error affected the outcome of the proceedings.[52]

The Michigan Constitution calls for separation of powers among the legislative, executive, and judicial branches of our state government, and provides that "[n]o person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."[53] As it relates to criminal sentencing, "the ultimate authority to provide for penalties for criminal offenses is constitutionally vested in the Legislature," while "[t]he authority to impose sentences and to administer the sentencing statutes *enacted by the Legislature* lies with the judiciary."[54] Because the court's sentencing power is not

---

[49] *People v Garza*, 469 Mich 431, 433; 670 NW2d 662 (2003).

[50] *People v Benton*, 294 Mich App 191, 203; 817 NW2d 599 (2011) (citation omitted).

[51] *People v McNally*, 470 Mich 1, 5; 679 NW2d 301 (2004).

[52] *Id*.

[53] Const 1963, art 3, § 2.

[54] *People v Hegwood*, 465 Mich 432, 436-437; 636 NW2d 127 (2001) (emphasis added).

constitutionally based, but rather derives from a legislative delegation of power,[55] its authority is necessary limited by the constraints established by the Legislature.[56] Thus, when the Legislature enacts a statute that requires a court to impose a mandatory minimum sentence for all defendants convicted of a particular offense, the resulting limitation on the court's sentencing discretion does not violate the Separation of Powers Clause.[57] As such, McBee's argument regarding the constitutionality of MCL 750.520b(2)(b) under the Separation of Powers Clause lacks merit.

## VI.  CRUEL OR UNUSUAL PUNISHMENT

Next, McBee contends that the 25-year statutory minimum sentence for CSC-I violates the prohibition against cruel or unusual punishment.  We disagree.

To preserve a claim that a sentence violates the constitutional prohibition against cruel or unusual punishment, the defendant must challenge the sentence on that basis in the lower court.[58] This issue is unpreserved, as McBee failed raising it before the trial court.[59] Thus, our review is limited to plain error affecting substantial rights.[60]

As McBee acknowledges, this Court has already held, in a published opinion, that the 25-year statutory minimum sentence for CSC-I does not violate the constitutional prohibition against cruel or unusual punishment.[61] Unless and until that decision is altered, this Court is bound to hold that McBee's sentence does not violate the prohibition against cruel and unusual punishment.[62]

## VII.  HEARSAY

In his Standard 4 brief, McBee argues that Chrystal Eichenlaub, a nurse who assisted in HM's medical examination, introduced inadmissible hearsay evidence by repeating a statement made by Smith during HM's examination.  McBee contends that he was denied the effective assistance of counsel when his defense counsel failed to object to the inadmissible hearsay and

---

[55] *People v Babcock*, 244 Mich App 64, 68; 624 NW2d 479 (2000), citing MCL 769.1(1).

[56] *Hegwood*, 465 Mich at 437.

[57] See, e.g., *People v Conat*, 238 Mich App 134, 148; 605 NW2d 49 (1999) (finding that statute requiring mandatory life sentence for an individual convicted of first-degree murder is not offensive to separation of powers principle).

[58] *People v Bowling*, 299 Mich App 552, 557; 830 NW2d 800 (2013).

[59] *People v Pennington*, 240 Mich App 188, 191; 610 NW2d 608 (2000).

[60] *Carines*, 460 Mich at 763, 774.

[61] *Benton*, 294 Mich App at 203-207.

[62] See MCR 7.215(C)(2) ("A published opinion of the Court of Appeals has precedential effect under the rule of stare decisis."); *People v Cross*, 281 Mich App 737, 738; 760 NW2d 314 (2008) (same).

that he was prejudiced by this failure because the hearsay testimony unfairly bolstered HM's credibility.  We disagree.

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal."[63]  To preserve an ineffective assistance of counsel claim, the defendant must bring a motion for a new trial or request a *Ginther* hearing to establish the basis for his claim.[64]  McBee did not object to Eichenlaub's testimony or raise this aspect of his ineffective assistance of counsel claim in his motion for a new trial.  As such, it is unpreserved.

"A defendant pressing an unpreserved claim of error must show a plain error that affected substantial rights, and the reviewing court should reverse only when the defendant is actually innocent or the error seriously affected the fairness, integrity, or public reputation of judicial proceedings."[65]  Ineffective assistance of counsel claims present a mixed question of fact and constitutional law.[66]  The lower court's findings of fact are reviewed for clear error, and its rulings on questions of constitutional law are reviewed de novo.[67]  Because this issue is unpreserved, this Court's review is limited to errors apparent from the record.[68]

A statement that falls within the definition of hearsay may not be introduced at trial unless it is deemed admissible under one of the exceptions to the general rule against hearsay.[69]  The Michigan Rules of Evidence defines hearsay as "a statement, other than the one made by the declarant while testifying at the trial or hearing, *offered in evidence to prove the truth of the matter asserted*."[70]  In pertinent part, Eichenlaub testified about the description of the January 7, 2014 incident provided by HM at the hospital.  The prosecution asked Eichenlaub to describe HM's demeanor at the time, and Eichenlaub answered: "She looked to her mother.  Her mother looked at her and said, 'It's your story, I can't tell it.'  And then she proceeded to tell me what I had written down."  McBee's argument lacks merit because it is clear that Smith's statement was not offered to prove its truth.  Rather, Eichenlaub was describing the conditions of HM's in-hospital disclosure, and conveying HM's initial reluctance to repeat her accusation against McBee.  Because the testimony was offered for a nonhearsay purpose, it did not violate the general rule against hearsay, and its admission did not constitute plain error.

---

[63] *Aldrich*, 246 Mich App at 113.

[64] *Payne*, 285 Mich App at 188.

[65] *Parker*, 288 Mich App at 509, citing *Carines*, 460 Mich at 763.

[66] *Jordan*, 275 Mich App at 667.

[67] *Id.*

[68] *Id.*

[69] MRE 802; *Musser*, 494 Mich at 350.

[70] MRE 801(c); *People v Chelmicki*, 305 Mich App 58, 62-63; 850 NW2d 612 (2014) (emphasis added).

McBee's related ineffective assistance of counsel claim also lacks merit. Eichenlaub's testimony did not introduce inadmissible hearsay; thus, defense counsel's failure to object on that ground was objectively reasonable. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel."[71] Furthermore, even if defense counsel's failure to object satisfied the first prong of the *Strickland* test, which it does not, McBee cannot establish that he was prejudiced by defense counsel's performance. Contrary to McBee's argument, Smith's statement, as repeated by Eichenlaub, did not prejudice him by bolstering HM's credibility. Eichenlaub merely described the circumstances surrounding HM's in-hospital disclosure. To the extent that the statement can be viewed as implying that HM's accusation was not coached or encouraged by Smith, McBee was not prejudiced by such a subtle suggestion. HM testified that she was being truthful and was not told by anyone to make up an accusation against McBee. Likewise, Smith denied that she coached HM to lie about McBee and added, "I really wish [I had], it would be a lot easier to deal with." Given HM's and Smith's explicit denials on that point, it is improbable that any such inference drawn from Eichenlaub's testimony affected the outcome of McBee's trial.

Affirmed.

/s/ Michael J. Talbot
/s/ Kirsten Frank Kelly
/s/ Stephen L. Borrello

---

[71] *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).